UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAVID GEARHART**,

    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Case No. 5:12 CV 2105

Magistrate Judge James R. Knepp II

MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff David Gearhart seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On August 18, 2009, Plaintiff filed an application for DIB claiming he was disabled due to an infected wound in his left hand, shoulder problems, skin problems, and a chin condition. (Tr. 95-100, 117, 147). In this appeal, Plaintiff alleges he is disabled due to mental impairments, specifically schizophrenia, although there was no mention of this impairment, or symptoms thereof, in his initial disability reports to the SSA. (*See* Doc. 17, at 9; Tr. 117-25, 126-31, 133-34, 138-140, 147-56, 158, 161, 167, 171, 176, 180). He alleged a disability onset date beginning May 1, 2006. (Tr. 97). His claim was denied initially (Tr. 65) and on reconsideration (Tr. 80). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 83). Plaintiff (represented by counsel) and a

vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 11, 31). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On August 15, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Plaintiff challenges only the ALJ's conclusions regarding his alleged mental impairment (*see* Doc. 17, at 8-15), and therefore waives any claims about the determinations of his physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Accordingly, the Court addresses the record evidence only to the extent it is relevant to Plaintiff's alleged mental impairment.

Daily Activities and Testimony

Plaintiff graduated high school, was a roofer for 22 years, and last worked in 2005. (Tr. 523). He consistently reported he did not work because of a left hand injury and skin infections. (Tr. 523, 526). Plaintiff participated in a variety of daily activities. For instance, he took care of his child, handled his personal care, cooked, cleaned, took out the trash, drove, watched television, shopped, socialized, and managed money. (Tr. 247-48, 321, 525, 539).

Medical Evidence - Skin Disorder Related to Mental Impairment

Plaintiff suffered from skin lesions, pimples, infections, and boils, which the evidence showed was the catalyst of his alleged mental impairment. Plaintiff believed these sores came from an infection "simmering inside him somewhere" – which he thought might be a fungus. (Tr. 18). He said he started getting abscesses all over his body in 2005 and had them continuously since that time. (Tr. 18). Indeed, Plaintiff had a history of repeated staphylococcus (staph) infections. (Tr. 19, 279,

2

291, 298). In May 2006, he had boils on his back, under his armpit, and on his legs, which were diagnosed as a staph infection. (Tr. 300). In July 2007, Plaintiff had a chin lesion which was eventually diagnosed as a staph infection. (Tr. 414 ). At the time, Plaintiff had been taking medication for a fungal infection, which the emergency room doctor informed him was not effective for a regular staph infection. (Tr. 414). In August 2007, Plaintiff returned to the emergency room and described the hair on his face as "crystallized like an infection." (Tr. 393). He was discharged with Ibuprofen. (Tr. 393).

On May 14, 2008, he was diagnosed with a staph infection and dermatophytosis. (Tr. 292). On March 12, 2009, Plaintiff was seen for boils on his back and hand, which he said "crystallized" and became "rock hard" after he drained them. (Tr. 482). He stated there was an "infection coming out of [his] skin." (Tr. 482). He was diagnosed with neurodermatitus and prescribed steroid creams. (Tr. 483). In August 2009, he saw Dr. Nagy because he was unsatisfied with his dermatologist who had been unsuccessful in diagnosing and treating his skin lesions. (Tr. 472). At that time, he had "30-40 individual lesions" on his chest, hands, shoulders, scalp, chin, feet, shins, and forearms, although they were not infected. (Tr. 472-73). Notes indicated Plaintiff "has had extensive work up without diagnosis." (Tr. 473).

On October 21, 2009, a dermatologist at Fairlawn Dermatology opined Plaintiff's skin condition was worse than normal due to Plaintiff's "mental disability" and "his constant denial of treatments." (Tr. 518). The dermatologist did not elaborate on Plaintiff's mental disability.

Plaintiff continued to receive care for lesions and boils through 2011. In October 2010, Plaintiff went to dermatologist Julie Mark, M.D. (Tr. 589-91). She thought Plaintiff might have an underlying mental disorder because of his "bizarre comments" regarding his skin. (Tr. 591). Plaintiff

3

stated he thought his hair was growing into his body and wax or multiple colored fluid was coming out of his skin. (Tr. 589). She spoke with Dr. Specht and they agreed Plaintiff needed a mental evaluation. (Tr. 591).

In January 2011, Plaintiff went to the emergency room for skin lesions and possible diagnoses were autoimmune bullous disease, porphyria, or pseudoporphyria. (Tr. 646). Dr. Eliot Mostow indicated he was "not completely sure what [was] going on" but was intrigued by hand lesions showing erosions and scarring. (Tr. 646).

On March 1, 2012, Dr. Mark authored a letter "To Whom It May Concern" and opined Plaintiff was delusional about his skin problem and was obsessed "that he ha[d] something serious, even deadly, wrong with him." (Tr. 665). She did not think Plaintiff had a serious skin problem and believed he was schizophrenic or had a schizoaffective disorder and should qualify for social security based on his severe psychiatric problems. (Tr. 665).

Medical Evidence – Mental Impairment

On January 11, 2008, Plaintiff saw consultive examiner Albert E. Virgil, Ph.D, J.D. for a clinical interview. (Tr. 245-49). (Tr. 246). Plaintiff denied hallucinations, delusions, and a history of psychiatric treatment. (Tr. 246-47). He was alert, oriented, had clear and understandable speech, logical and coherent thought content, and intact memory. (Tr. 246-47). Plaintiff counted backwards and recalled five digits forward and three digits backward. (Tr. 247). He said he graduated high school, then trained in diesel mechanics for a year where he was "at the top of [his] class". (Tr. 246). Plaintiff said he was not working because of a left hand injury and was "pretty depressed" because medical providers allegedly told him there was nothing they could do for his hand. (Tr. 245-47). Dr. Virgil indicated Plaintiff was capable of cooperating with supervisors and/or coworkers in

a normally pressured work setting, his concentration, persistence, and pace were not impaired, and he could complete routine activities of daily living. (Tr. 248-49). He also found Plaintiff's abilities to understand, remember, and follow instructions in a pressured work setting were not significantly impaired and he was mentally capable of understanding, remembering, and following simple, and some multi-step, repetitive tasks. (Tr. 248). Dr. Virgil diagnosed adjustment disorder with depressed mood but specifically noted no evidence of a psychotic disorder. (Tr. 247-48). He assigned Plaintiff a global assessment of functioning (GAF) score no higher than 60.[1]

State agency psychologist Bruce Goldsmith, Ph.D. completed a Psychiatric Review Technique (PRT) on January 14, 2008. (Tr. 250-263). Dr. Goldsmith opined Plaintiff had adjustment disorder with depressed mood, but no functional limitations as a result. (Tr. 254, 261). He specifically noted Plaintiff had no restrictions of activities of daily living, no difficulties maintaining social functioning or concentration, persistence, or pace, and no episodes of decompensation. (Tr. 261). On June 23, 2008, state agency psychologist Alice Chambly, Ph.D., affirmed Dr. Goldsmith's opinion. (Tr. 305).

In September 2009, Plaintiff's dermatologist referred him to Drs. Locala and Parrisbalogun for psychological evaluations due to the dermatologic lesions over his body. (Tr. 510-15). Plaintiff reported he had a large sore on the back of his head that was "the root of all evil." (Tr. 512). He said there was an infection in his body that needed to get out. (Tr. 512). Notes indicated Plaintiff "has

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

had multiple evaluations by dermatology, as well as primary care doctors, and treatments with antibiotics . . . but with no long-term resolution of symptoms." (Tr. 510). On examination, he had multiple scars and lesions in various states of healing. (Tr. 510). His girlfriend reported Plaintiff picked and scrubbed the sores. (Tr. 510).

Dr. Locala diagnosed Plaintiff with simple delusional disorder with a component of compulsive behavior and recommended antipsychotic medication, but noted Plaintiff was reluctant to take it. (Tr. 510). Plaintiff "[wa]s very resistant to acknowledging []psychological issues may be playing a role [] or [] anxiety may be exacerbating his symptoms." (Tr. 510). Dr. Parrisbalogun noted Plaintiff was cooperative, had good eye contact, appropriate socialization, fair mood, congruent affect, normal speech, concrete thought process, and intact concentration. (Tr. 512-15). Plaintiff had neither hallucinations or past psychiatric history. (Tr. 513, 515). Nevertheless, she diagnosed Plaintiff with specific delusion and assigned him a GAF score of 45.[2] (Tr. 515). Dr. Parrisbalogun recommended both psychotherapy and antipsychotic medication, but Plaintiff would not comply. (Tr. 515).

On February 3, 2010, Plaintiff presented to Sudhir Dubey, Psy.D. for a psychological evaluation. (Tr. 522-27). Plaintiff denied delusions, hallucinations, obsessions, or compulsions. (Tr. 524). He reported general anxiety due to his skin disorder and symptoms consistent with mild depression. (Tr. 524). During the exam, Plaintiff was cooperative, alert, oriented, and had coherent speech, logical progression of goals to ideas, appropriate affect, normal emotional reactions, good insight, and good judgment. (Tr. 524-25). Concerning daily activity, Plaintiff reported he watched

---

2. A GAF score of 45 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

6

television, cooked, cared for his child, handled his personal care, drove, shopped, independently performed chores, and managed money. (Tr. 526). Dr. Dubey diagnosed Plaintiff with depressive disorder, not otherwise specified, and assigned him a GAF score of 60.[3] (Tr. 526). He found Plaintiff was not impaired in his abilities to understand, remember, and follow simple instructions; maintain attention, concentration, persistence, and pace for simple repetitive tasks; relate to others, including fellow workers and supervisors; withstand stress and pressure associated with day-to-day work; and understand and follow complex instructions. (Tr. 526-27). He found Plaintiff's ability to perform complex tasks moderately impaired because he demonstrated problems recalling digits. (Tr. 527).

On March 1, 2010, state agency psychologist Leslie Rudy, Ph. D., completed a PRT assessment and a mental residual functional capacity (RFC) assessment. (Tr. 537-54). Dr. Rudy noted Plaintiff "allege[d] disability due to physical conditions only" and presented no evidence of a psychiatric condition. (Tr. 539). She diagnosed Plaintiff with depressive disorder, not otherwise specified, and opined he had no restrictions of activities of daily living, mild difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 544, 551). Dr. Rudy found Plaintiff was either not significantly limited or there was no evidence of limitation for all categories of mental functioning, except he was moderately limited in his ability to understand, remember, and carry out detailed instructions and maintain concentration for extended periods. (Tr. 537-38). She specifically found Plaintiff retained the capacity for simple, repetitive and familiar multi-step tasks in a setting with infrequent changes in job duties. (Tr. 539).

---

3. *See supra* footnote 1.

VE Testimony and ALJ Decision

At the hearing, the ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work experience who could perform work at the medium exertional level, except that he was limited to simple, repetitive, routine, and familiar multi-step tasks in a setting with infrequent changes in job duties. (Tr. 56). The VE testified such an individual could perform work in the national economy as a cafeteria attendant, surveillance monitor, parking lot attendant, and production assembler. (Tr. 56).

On May 5, 2011, the ALJ found Plaintiff had the severe impairments of coronary artery disease, neurodermatitus, and an affective disorder (Tr. 16). However, the ALJ found these impairments did not meet or medically equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 18). Based on VE testimony, the ALJ found Plaintiff had the RFC to perform medium work, except that he was limited to simple, routine, repetitive work, and familiar multi-step tasks in a setting with infrequent change. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court  "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the

9

national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts the ALJ should have found he met Listing Impairment 12.03 based on certain physician opinions. (Doc. 17, at 9-10). Plaintiff also contends the ALJ incorrectly assessed his credibility. (Doc. 17, at 10-14). Last, he asserts that because the ALJ did not properly weigh the opinions of Drs. Parrisbalogun and Locala, he failed to present an accurate hypothetical to the VE.

### Listing Impairment 12.03

The ALJ analyzed Plaintiff's mental impairment under Listing Impairment 12.04, affective disorders, which among other combinations of symptoms, required Plaintiff to establish he suffered from depressive syndrome in combination with delusions, hallucinations, or paranoid thinking. 20 C.F.R. pt. 4, subpt. P, App. 12.04. Plaintiff argues the ALJ erred at step three of the sequential evaluation because he failed to consider physician opinions indicating he had a condition that met or equaled listing impairment 12.03, which covers schizophrenia, paranoid and other psychotic disorders characterized by the onset of psychotic features. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §12.03.

Listing 12.03 contains three parts or sets of criteria. Paragraph "A" requires a claimant to medically substantiate the presence of a mental disorder. App. 1, § 12.00A. Paragraphs "B" and "C" describe impairment-related functional limitations incompatible with the ability to perform gainful activity. App. 1, § 12.00A. To satisfy Listing 12.03, a claimant must either establish the

requirements of both Paragraphs "A" and "B" or only the requirements in Paragraph "C." App. 1, §§ 12.00A, 12.03. Importantly, "[the claimant] must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original); *see also King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) ("lack of evidence indicating the existence of all requirements . . . provides substantial evidence to support the [Commissioner's] finding that claimant did not meet the Listing").

Plaintiff does not meet the Paragraph A criteria of Listing 12.03, which requires medically documented persistence, either continuous or intermittent, of one or more of the following: 1) delusions or hallucinations; 2) catatonic or other grossly disorganized behavior; 3) incoherence, loosening of associations, illogical thinking, or poverty of content of speech with either blunt affect, flat affect, or inappropriate affect; or 4) emotional withdrawal and/or isolation.

First, the only physician of record to indicate Plaintiff might have either schizophrenia or a schizoaffective disorder was Dr. Mark, Plaintiff's *dermatologist*. Second, no psychologist or psychiatrist diagnosed Plaintiff with an impairment or a combination of symptoms that met the criteria in Paragraph A for Listing 12.03. For instance, Dr. Virgil diagnosed Plaintiff with adjustment disorder with depressed mood, specifically noting there was no evidence of a psychotic disorder. (Tr. 247-48). Dr. Goldsmith found Plaintiff had adjustment disorder (Tr. 254), and Drs. Dubey and Rudy found Plaintiff had depressive order, not otherwise specified (Tr. 526, 544, 551). While Drs. Locala and Parrisbalogun found Plaintiff had a delusional disorder (Tr. 510, 515), these diagnoses, or symptoms thereof, were not persistent or continually noted. In addition, the ALJ analyzed whether Plaintiff's mental impairment met Listing 12.04 – affective disorders – which specifically accounts for delusions.

Plaintiff hanging his hat on a dermatologist's opinion of his mental condition is akin to relying on the observation of a podiatrist to establish a heart condition. Importantly, until this appeal, Plaintiff himself never alleged he was disabled because of a mental condition; rather, he steadfastly denied suffering from delusions or hallucinations and refused to take antipsychotic medication. During his assessment with Dr. Virgil, Plaintiff denied hallucinations, delusions, or a history of psychiatric treatment. (Tr. 246-47). He was alert, oriented, had clear and understandable speech, logical and coherent thought content, and intact memory, but was "pretty depressed" about his skin condition and left hand. (Tr. 245-47). Dr. Parrisbalogun noted Plaintiff was cooperative, had good eye contact, appropriate socialization, fair mood, congruent affect, normal speech, concrete thought process, and intact concentration. (Tr. 512-15). While she recommended antipsychotic medication, Plaintiff would not comply and denied hallucinations or psychiatric history. (Tr. 515). Plaintiff also denied delusions, hallucinations, obsessions, or compulsions to Dr. Dubey. (Tr. 524). And he was cooperative, alert, oriented, had appropriate affect, normal emotional reactions, and good insight and judgment but was anxious about his skin disorder. (Tr. 524-25).

Moreover, the record is clear Plaintiff actually had a skin disorder that largely remained untreated and undiagnosed. At one point, Plaintiff changed dermatologists when he had 30-40 individual lesions on his body without a diagnosis. (Tr. 472-43). And when Plaintiff said there was an infection "simmering inside him somewhere", there actually was: he was consistently diagnosed with staph infections. (Tr. 18, 19, 275, 291, 298).

Even if Plaintiff met Listing 12.03 Paragraph A criteria, which he does not, he would still fail to meet the Paragraph B criteria. *Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, [the claimant] must meet *all* of the specified medical criteria."). Specifically, Plaintiff did not demonstrate his impairment resulted in at least two of the following:

12

1) marked restriction of daily activity; 2) marked restriction in maintaining social functioning; or 3) marked restriction in concentration, persistence, or pace; or 4) repeated episodes of decompensation. As the ALJ pointed out, Plaintiff had no limitations in his daily activities of living, mild limitations in social functioning, moderate limitations concentration, persistence, and pace, and no episodes of decompensation. The record supports the ALJ's conclusion.

Concerning daily activity, Plaintiff told Drs. Virgil and Dubey he took care of his child, maintained his personal care, cooked, cleaned, drove, watched television, shopped, and socialized. (Tr. 247-48, 321, 525, 539). Drs. Goldsmith and Rudy found Plaintiff had no restrictions of daily activities. (Tr. 261, 544, 551). Indeed, Plaintiff did not cite any evidence in the record indicating he suffered from marked restrictions of daily activities due to his mental impairment.

The record also showed Plaintiff had only mild difficulties in social functioning. For instance, Dr. Virgil indicated Plaintiff was capable of cooperating with supervisors and coworkers in a normally pressured work setting. (Tr. 248-49). Dr. Dubey found Plaintiff was not impaired in his ability to relate to others, including fellow workers and supervisors. (Tr. 526-27). Dr. Goldsmith noted Plaintiff had no limitation in social functioning (Tr. 261) and Dr. Rudy found Plaintiff had only mild difficulties; however, he also found Plaintiff was not significantly limited in his ability to interact appropriately with the general public and was not limited in his ability to ask simple questions, request assistance, accept instruction and respond to criticism (Tr. 538, 544, 551). In addition, Plaintiff reported he socialized with friends, helped them raise their children, and spent time with his girlfriend and his own child. (Tr. 248, 525).

With respect to concentration, persistence, or pace, Drs. Virgil and Dubey found Plaintiff was not impaired evidenced by his ability to count backwards and recall five digits forward and three digits backward. (Tr. 247, 249, 525-27). Notes also showed Plaintiff was oriented, had intact

memory, and intact concentration. (Tr. 247-49, 525-27). Dr. Goldsmith noted he had no difficulties concerning concentration, persistence, or pace (Tr. 261) and Dr. Rudy found Plaintiff, at most, had moderate difficulties. (Tr. 261, 551). Finally, there was no evidence of decompensation.

Plaintiff also fails to meet Paragraph "C" criteria of Listing 12.03 which requires a claimant to document a "residual disease process" resulting in "such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" or that records demonstrate a "current history if 1 or more years" inability to function outside a highly supportive living arrangement, with an indiction of continued need for such arrangement" See 20 C.F.R., part 404, subpt. P, app. 1, § 12.03C. In addition, a claimant needs to present medically documented evidence of symptoms that include present delusions or hallucinations. *Id.* Simply stated, Plaintiff has presented no such evidence.

Accordingly, Plaintiff fails to demonstrate he medically equaled Listing 12.03 and substantial evidence supports the ALJ's decision.

**Credibility**

A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

> (I) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

In this appeal, Plaintiff alleges he was delusional because he consistently complained about

a skin disorder when his doctors found nothing. (Doc. 17, at 12). This argument has no merit. First, as explained above, while Plaintiff may have been obsessed about his skin disorder, he actually did suffer from a skin disorder, evidenced by documented lesions and staph infections. (Tr. 19, 279, 291, 298, 300, 393, 414, 472-73, 482). While Plaintiff made some "bizarre comments" and was noted to be an "interesting gentleman", this hardly showed he was schizophrenic, as one dermatologist suggested. (Tr. 591, 646, 665). To the contrary, nearly every psychologist or medical health provider weighing in on Plaintiff's mental health found him to be alert, oriented, cooperative, with good eye contact, appropriate mood, congruent affect, concrete thought process, normal speech, intact memory, good insight, and good judgment. (Tr. 246-47, 512-515, 524-25). He also consistently denied delusions, hallucinations, and a psychiatric history. (Tr. 246-47, 513, 515, 524). Indeed, he never claimed he was disabled from a mental impairment in his disability reports and applications, nor did he mention suffering from any symptoms thereof.

The ALJ properly noted all of Plaintiff's symptoms, mental evaluations, and daily activities and concluded Plaintiff was not entirely credible when he alleged he was functionally precluded from working. As noted above, Plaintiff had no limitations of daily activities, mild limitation in social functioning, and moderate limitation in concentration persistence, or pace. In addition, the ALJ noted Plaintiff did not require hospitalization or other aggressive forms of treatment for his alleged mental impairment. The ALJ's conclusion is supported by substantial evidence.

**Opinions of Consultive Psychologists**[4]

Plaintiff contends the ALJ erred by not giving the reports of Drs. Locala and Parrisbalogun

---

4. Under the regulations, Drs. Parrisbalogun and Locala are "nontreating sources" because they are "psychologist[s], or other acceptable medical source[s] who ha[ve] examined [Plaintiff] but do[] not have, or did not have, an ongoing treatment relationship with [Plaintiff]." 20 C.F.R. §404.1502.

any weight.[5] However, this argument fails because an ALJ is not required to provide a "proper explanation" for his rejection of a consultive examiner's opinion. *Slusher v. Astrue*, 2009 WL 2511936, *3 (E.D. Ky 2009); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873 (6th Cir. 2007). Simply stated, there exists no regulation which required the ALJ to explain how much weight he assigned to Drs. Parrisbalogun or Locala. *Slusher*, 2009 WL 2511936, *3 (*citing Smith*, 482 F.3d at 875) (The Social Security Act's requirement that ALJ's give "good reasons" for the weight given to medical opinions applies only to treating sources). Therefore, while ALJ's must "evaluate every medical opinion [they] receive," 20 C.F.R. § 404.1527(d), the promise to articulate "good reasons" for the weight given to a medical opinion only applies to the opinions treating sources. *See Smith*, 482 F.3d at 876.

Nevertheless, the ALJ summarized the doctors' findings[6] and noted the diagnoses of specific delusion and Dr. Parrisbalogun's GAF score of 45, which indicated serious symptoms or serious impairment in social or occupational functioning. (*See* Tr. 20 *referring to* 510-15). However, the ALJ rejected these opinions by choosing to give great weight to the opinions of consultive examiners Drs. Virgil and Dubey, who found Plaintiff did not suffer from delusions or hallucinations, had no psychiatric history, and had a GAF of 60, which indicated moderate bordering on mild limitations. (Tr. 246-47, 524). In addition, the ALJ afforded great weight to state agency reviewers Drs.

---

5. Plaintiff argues the ALJ erred because he did not identify the weight he gave treating dermatologist Dr. Fuller who indicated Plaintiff had a GAF score of 45. However, it was Dr. Parrisbalogun who gave the GAF score, not Dr. Fuller. Dr. Fuller merely referred Plaintiff to a psychiatrist for a consultive examination. (Tr. 512-515). Therefore, the treating physician rule does not apply here.

6. While the ALJ referenced only Dr. Parrisbalogun, Dr. Locala's report largely reflected the same findings. Indeed, Dr. Locala incorporated Dr. Parrisbalogun's report and diagnosis into his assessment and both were part of the same exhibit. (*See* Tr. 510-11 *referring to* Tr. 512-15).

Goldsmith and Rudy, who found Plaintiff had adjustment disorder with a depressed mood but no functional limitations as a result, and absolutely "no evidence of a psychiatric disorder." (Tr. 254, 261, 539).

Consistent with the Commissioner's regulations and rulings, the ALJ was not required to afford weight to the opinions of Drs. Parrisbalogun and Locala, and because substantial evidence supports his decision, the ALJ did not err. As described above, Plaintiff could function daily and perform a plethora of activities, he denied delusions and hallucinations, refused to take antipsychotic medication, and socialized well with others. The ALJ did not err in assessing these medical providers' opinions.

**Step Five Analysis**

Finally, Plaintiff alleges the ALJ did not adequately describe a hypothetical worker with Plaintiff's limitations to the VE and as a result, the ALJ relied on a VE's response to an improperly formulated hypothetical. (Doc. 17, at 14). Plaintiff's argument fails.

Only those limitations which are supported by the record need to be included in hypothetical questions to the VE. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). In this case, the ALJ posed a hypothetical question to the VE that reflected all of Plaintiff's credibly established limitations. Specifically, the ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work experience who could perform work at the medium exertional level, except that he was limited to simple, repetitive, routine, and familiar multi-step tasks in a setting with infrequent changes in job duties. (Tr. 56). The VE testified such an individual could perform work in the national economy as a cafeteria attendant, surveillance monitor, parking lot attendant, and production assembler. (Tr. 56).

Plaintiff contends the ALJ erred by not including limitations concerning Plaintiff's

"significant delusions" based on the opinions of Drs. Parrisbalogun and Locala. (Doc. 17, at 14). However, as described above, the limitations those doctors provided were inconsistent with substantial evidence in the record and did not warrant significant weight under the regulations. Accordingly, the ALJ did not err at step five of the sequential evaluation.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge
